## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

SENATOR OPHELIA FORD, WILLIAM )
MARTIN SCRUGGS, PAUL F. LOWE, AND )
GWENDOLYN ELLERSON )
                                      )

    **Plaintiffs,** )

                                        )

v.                                  )     No. 2:06-cv-2031 D/V
                                        )     JUDGE BERNICE DONALD

SENATORS MAE BEAVERS, DIANE BLACK, )
JIM BRYSON, TIM BURCHETT, RUSTY )
CROWE, RAYMOND FINNEY, DAVID )
FOWLER, BILL KETRON, RANDY MCNALLY, )
JEFF MILLER, MARK NORRIS, CURTIS )
PEARSON, JR., RON RAMSEY, STEVE )
SOUTHERLAND, JIM TRACY, MICHAEL R. )
WILLIAMS, JAMIE WOODSON, KATHRYN I. )
BOWERS, CHARLOTTE BURKS, STEPHEN I. )
COHEN, JERRY W. COOPER, WARD )
CRUTCHFIELD, THELMA HARPER, JOE M. )
HAYNES, DOUGLAS HENRY, ROY HERRON, )
DOUG JACKSON, TOMMY KILBY, )
ROSALIND KURITA, JAMES F. KYLE, JR., )
DON MCCLEARY, LT. GOV. JOHN S. )
WILDER, AND TERRY ROLAND )
                                        )

    **Defendants**. )

---

# MEMORANDUM IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

---

       The State Defendants hereby submit this memorandum of law in support of their motion to dismiss Plaintiffs' amended complaint for lack of subject matter jurisdiction and failure to state a claim and in response to Plaintiffs' motion for a preliminary injunction.

## I.  INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff, Ms. Ophelia Ford ("Ms. Ford") defeated Terry Roland ("Mr. Roland") by a margin of 13 votes in a Special Election for the Senatorial seat for the 29th District of Tennessee on September 15, 2005.  The election results were subsequently certified by the Shelby County Election Commission to the State Coordinator of Elections.  On September 23, 2005, Mr. Roland filed an election contest in Shelby County Chancery Court, pursuant to Tenn. Code Ann. § 2-17-105, alleging that there were numerous irregularities and improprieties in the election and that more than 13 votes had been illegally cast on behalf of Defendant Ophelia Ford.[1]  Mr. Roland also filed an election contest in the Tennessee Senate, asserting that the Senate should void the election because of a number of illegally cast ballots and because there was sufficient proof that fraud and/or irregularities so permeated the election as to render the whole election incurably uncertain.  The parties ultimately dismissed the Shelby County Chancery court action, agreeing that the Tennessee State Senate had exclusive jurisdiction over the election contest.

Mr. Roland's election contest rests primarily upon four categories of allegedly illegal votes: (1)  several votes cast on behalf of dead citizens; (2) votes case by several felons who had not had their voting rights restored; (3) votes cast by several citizens who were not residents of the 29th District; and, (4) votes cast by voters who had not signed both the application for ballot and the poll book.

Pursuant to the authority granted to him under the Senate's rules, the Speaker of the Senate (Lt. Governor John Wilder) formed a Special Ad Hoc Committee to investigate these

---

[1]*See Terry Roland v. Phil Bredesen, et al.*, Shelby County Chancery Court No. CH-05-1767-3.

allegations and make a report and recommendation to the full Senate.  The committee consisted of three Democratic Senators (James Kyle, Joe Haynes, and Roy Herron) and three Republican Senators (Chairman Mike Williams, Jeff Miller, and Ron Ramsey).  To date, this committee has met four times, with at least one meeting being held in Shelby County.  At each of these meetings, both Ms. Ford and Mr. Roland, and/or their representatives, were given the opportunity to speak and present evidence, as well as to submit briefs and evidence in support of their positions.  In addition, the Committee heard testimony from a variety of other sources, including the State Coordinator of Elections, members of the Shelby County Election Commission, as well as citizens from the 29th District.  At the last meeting of the Committee on January 9th, the Committee voted to delay making a report and recommendation to the Senate until it had received further information from the State Election Coordinator, initially requested by Mr. Roland.  That information was provided to the Committee on January 18th, and the Committee is currently scheduled to meet on Tuesday, January 24th at 11:30 a.m. to allow Ms. Ford and Mr. Roland one final opportunity to present evidence and argument to the Committee.

In the meantime, on January 17, 2006, the Senate, meeting as a Committee of the Whole, voted to send Proposed Senate Resolution 7002 by Senator Ramsey to the floor of the full Senate to be voted upon.  Proposed Senate Resolution 7002 stated that the Senate had found that in the Special Election, several ballots were cast on behalf of deceased individuals; several ballots were cast by convicted felons; several ballots were cast by individuals not residing in the 29th District; several ballots were void as the voters did not sign either the poll book or ballot application; and, that these irregularities so pervaded the electoral process as to render the election untrustworthy.  Accordingly, Proposed Senate Resolution 7002 proposed to resolve that the Senate void the

3

Special Election of Ms. Ford.  This Resolution was scheduled to be brought up on the floor of the Senate on Thursday, January 19, 2006.

However, before such action could take place, Plaintiffs filed a complaint and request for Temporary Restraining Order, seeking to enjoin the individual Senators from voting either to affirm or void the Special Election.  This Court granted the request for a temporary injunction on January 18, 2006.  Thereafter, on January 23rd, Plaintiffs filed an amended complaint, which added additional plaintiff voters, as well as several new causes of action.

## II.  SUMMARY OF ARGUMENT

Plaintiffs are Ms. Ophelia Ford and three individuals, all of whom are residents of Senate District 29 and who voted in the September 15, 2005 Special Election.  Plaintiffs' amended complaint seeks declaratory and injunctive relief for violations of their rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as their rights under Section 2 of the Voting Rights Act of 1965, 42 U.S.C. §§ 1971, 1973, and 1983.  Specifically, Plaintiffs allege that the "proposed actions of the Defendants" (presumably the voiding of the special election of Ms. Ford) would constitute arbitrary and disparate treatment and deny them of their fundamental right to vote in violation of the Equal Protection Clause.  They also allege that such "proposed actions" would deprive them of a liberty interest in violation of the Due Process Clause.  They further allege that the Defendants' "proposed action" would "deny the right to vote on account of race or color," in violation of Section 1973 of the Voting Rights Act, and that the disqualification of votes for failure to "double-sign" by the voter would violate Section 1971 of that Act.  Finally, Plaintiffs allege that the Senate's proposed action would violate Art. I, § IV of the Tennessee Constitution.

Plaintiffs seek an order declaring that the voiding of the Senate District 29 election results "as contemplated by the Senate" would violate their constitutional and federal rights and enjoining the individual Senators from "voiding the election results in Senate District 29." Plaintiffs further seek an order enjoining the individual Senators from essentially acting in an unconstitutional manner.

Plaintiffs' amended complaint should be dismissed in its entirety for lack of ripeness, as the Senate has yet to act.  Furthermore, the amended complaint should be dismissed for lack of standing, as none of the Plaintiffs can establish a particularized or concrete injury, much less one that is traceable to any individual Senator.

In the alternative, the principles of federalism counsel against this Court enjoining the Defendants from taking action where the balance of harm in this case clearly weighs in favor of the Defendants in light of the fact that plaintiffs have not demonstrated any irreparable harm which is clear and imminent, and irreparable harm exists to the public interest in permitting a federal district court to enjoin a state senate from "judging the qualifications and elections of its members", thereby preempting and prejudging issues that are constitutionally and statutorily committed to that legislative body.

With respect to the claims asserted by Ms. Ford, Defendants submit that these should be dismissed pursuant to Supreme Court and Sixth Circuit precedent stating that federal courts should abstain from deciding issues that have not yet been decided by state mechanisms. Defendants, in the alternative, also assert that federal intervention in this election contest is improper given that there is no discrete group of voters being disenfranchised.

Should this Court decide to reach consideration of each individual claim, Defendants assert they should also be dismissed.  First, all Equal Protection claims should be dismissed because neither Ms. Ford, nor any group of voters in this election, is being subjected to disparate treatment.  Second, all Voting Rights Act claims should be dismissed for failure to plead facts upon which a violation could be founded, as there has been no disparate treatment of any protected and particularized class of voters in District 29, and no protected and particularized class of voters was denied the right to vote in District 29.  Additionally, no plaintiff has been prevented from registering to vote due to an error or omission in violation of Section 1971 of the Voting Rights Act.  Third, all Due Process claims should be dismissed because none of the Plaintiffs has a protected property interest and the process, to this point, has afforded Ms. Ford the opportunity to notice and a fair hearing.  Finally, Plaintiffs' claims under the Tennessee Constitution should be dismissed for failure to state a claim, as Art. I, § IV only speaks in terms of the qualifications to vote, not to have the votes counted.

### III.  ARGUMENT

### A. THIS CASE IS NOT RIPE FOR REVIEW AND THE COURT SHOULD DISMISS THE AMENDED COMPLAINT.

**1.     Ripeness**

"The jurisdiction of federal courts is limited by Article III of the United States Constitution to consideration of actual cases and controversies, therefore federal courts are not permitted to render advisory opinions." *Adcock v. Firestone Tire and Rubber Co.*, 822 F.2d 623, 627 (6th Cir. 1987).  "Ripeness is more than a mere procedural question; it is determinative of jurisdiction.  If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Bigelow v. Michigan Dept. Of Natural Resources*, 970 F.2d 154, 158 (6th

Cir. 1992) (citations omitted).  The Supreme Court has also stated that if a state provides an adequate procedure for grievances, then a citizen cannot claim a violation of federal law until that litigant has "used the procedure and been denied."  *Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985) (finding that claimant could not maintain a claim in federal court for denial of just compensation for a taking until that litigant had taken advantage of, completed, and been denied in state procedure for obtaining just compensation).

**2.      This Court should not consider these claims until the Senate has actually acted.**

Because the Senate has not acted,  Plaintiffs' claims are not appropriate for judicial resolution and any hardship to the Plaintiffs is not sufficient to warrant intrusion by this Court prior to any such action.

In *Young v. Klutznick*, the Mayor of Detroit brought suit against the Census Bureau Director and the Secretary of Commerce seeking the adjustment of the 1980 census to account for an undercount of some minority groups.  652 F.2d 617, 618 (6th Cir. 1981).  The district court ordered that the defendants withhold certification of the census numbers pending the submission of a report to the court for approval of a statistically defensible means of adjusting the census figures.  *Id.*  The Sixth Circuit reversed the district court on the basis of standing and ripeness. *Id.*

The court reasoned that problems of prematurity and abstractness may prevent adjudication.  *Id.* at 625.  In examining whether a case is ripe for adjudication, the court set forth a two part test: first, the court must determine if the issues are appropriate for judicial resolution,

and second, the court must assess the hardship to the parties if judicial relief is denied at that

time.  *Id.*

In relation to the question of appropriateness for judicial resolution, the court stated,

"[b]ecause the Michigan state legislature has not yet expressed its reaction to the census

enumeration, the issue before this Court has not become as 'specific' or as 'particularized' as it

will become after the legislature acts."  *Id.* at 626.  The court further reasoned,

> "[e]ven if the ultimate response of the legislature could be
> predicted with some confidence, however, the fact that it is a
> representative, deliberative organ of state government rather than a
> private party must make this Court hesitate to exercise its power so
> as to narrow the range of solutions it might consider.  As the
> Supreme Court has pointed out, the reasons a governmental body
> might provide for its actions are important in review of those
> actions."

*Id.* (citations omitted).

In relation to the question of hardship to the parties, the court reasoned that because the

alleged dilution of voting power may not occur at all and cannot occur until the legislature acts,

the hardship to the plaintiff was not sufficiently significant.  *Id.*

Here, the Court faces a very similar situation.  Plaintiffs claim that their federally secured

rights have been violated prior to any official action by the Senate on the issue of whether to

void the Special Election.  Just as in *Klutznick*, the issues before this Court are not appropriate

for judicial resolution as the Senate has yet to express its reaction to the election contest.  As

such, the issues have not become as specific or particularized as they will be after the Senate

renders its decision.  While Plaintiffs claim that they can predict with confidence what action the

Senate will take, this Court, under the principles intimated by the Sixth Circuit in *Klutznick*,

should still refrain from considering their claims until the Senate has taken action.  To do so

8

would be to possibly narrow the range of solutions the Senate may consider and leaves the Court

to rule without knowing why the Senate chose to vote the way it eventually votes.  In addition,

given that the alleged violations the Plaintiffs complain of may never occur and can definitely

not occur until the Senate acts, consideration of the hardship to the parties weighs in favor of

Defendants and in favor of withholding review.

**3.      This Court should not opine on issues of law that have not come to be enforced.**

The issues before this Court are not ripe for review because any decision by this Court

before action by the Senate would amount to an advisory opinion on abstract disagreements that

may never need to be answered.

The ripeness doctrine is designed to "prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also to protect the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 148-49 (1967).  "Ripeness becomes an issue when a case is anchored in

future events that may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw*,

132 F.3d 272, 284 (6th Cir. 1997).

Here, Plaintiffs are asking this Court to engage in an abstract exercise in Tennessee

election law.  As it stands today, Ms. Ford's margin of victory is 13 votes.[2]  In the election

contest before the Senate, Terry Roland has asked the Senate to consider voiding approximately

---

[2]Both sides have agreed that there are six votes that are illegal and should not be counted:  two cast by deceased persons; three cast by convicted felons whose right to vote has not been reinstated; and, one cast by an individual living outside of the district.  Additionally, there are two more votes that both sides have agreed are questionable.  Thus, while not important to this argument, this count seems to put the margin of victory at seven votes at the most.

150 votes for four reasons: first, an Internet search suggested that forty-four voters may have voted in districts in which they did not reside; second, ninety voters did not sign both the poll book and the ballot application; third, one voter was on pretrial diversion for a felony charge; and fourth, one poll worker forged the signature of another poll worker at a voting location, implicating approximately 10 votes.  Given that the margin is only 13 and several of the grounds for contesting the election are larger than the margin, the Senate may decide to void the election on only one of the four grounds.[3]  However, by asking this Court to intervene at this time, Plaintiffs are asking the Court to opine about all four grounds, a purely hypothetical exercise that may be completely unnecessary.[4]

It is also important to note, that contrary to the Sixth Circuit's holding that the ripeness doctrine requires the challenging parties to have felt the effects of the decision they complain of in a concrete way, the Plaintiffs here have suffered no injury.  *See Abbott Labs.*, 387 U.S. at 148-

---

[3]For example, a majority of the Senate could determine to void the election on the second ground, *i.e.*, the failure to sign the ballot application or poll book.  Assuming this were a proper ground for invalidating the election, then consideration of the other three grounds would be unnecessary.  Indeed, there is some authority in Tennessee caselaw that would suggest this is a proper ground for invalidating a vote.  *See Payne v. Ramsey*, 591 S.W.3d 434, 437 (Tenn. 1979) (Supreme court held that absentee ballot should be invalidated for failure by voter to sign application for ballot).

[4]Further instruction on this issue can be taken from the Supreme Court's decision in *Younger v. Harris*.  The Court stated, "But this vital responsibility [the responsibility to ensure unconstitutional statutes are not enforced], broad as it is, does not amount to an unlimited power to survey the statute books and pass judgment on laws before the courts are called upon to enforce them.  Ever since the Constitutional Convention rejected a proposal for having members of the Supreme Court render advice concerning pending legislation it has been clear that, even when suits of this kind involve a 'case or controversy' sufficient to satisfy the requirements of Article III of the Constitution, the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring corrections of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary.  The combination of the relative remoteness of the controversy, the impact on the legislative process of the relief sought, and above all the speculative and amorphous nature of the required line-by-line analysis of the detailed statutes ordinarily results in a kind of case that is wholly unsatisfactory for deciding constitutional questions, whichever way they may be decided.  In light of this fundamental conception of the Framers as to the proper place of the federal courts in the governmental process of passing and enforcing laws, it can seldom be appropriate for these courts to exercise any such power of prior approval or veto over the legislative process.  *Younger v. Harris*, 401 U.S. 37, 52-53 (1971).

49.  Indeed, the amended complaint specifically alleges that Ms. Ford's election has been certified and no action has yet been taken by anyone to declare that election void.  The amended complaint further alleges that each of the voter plaintiffs voted in the Special Election — but significantly — does not allege that their votes were not counted.  As such, it is patently obvious that Plaintiffs' entire amended complaint is fundamentally anchored in a future event, i.e., a vote by a majority of the Senate to void the election —  an event that may or may not occur.  Such premise is in direct contravention of Sixth Circuit precedent that requires that the case not be anchored in future events that may never occur or may not occur as anticipated.  *See Nat'l Rifle Ass'n of Am.,* 132 F.3d at 284.  Accordingly, Plaintiffs' amended complaint should be dismissed in its entirety for lack of ripeness.

## B.  PLAINTIFFS DO NOT HAVE STANDING TO ASSERT THEIR CLAIMS.

The lack of standing poses an insurmountable obstacle to the pursuit of this Amended complaint by Plaintiffs.  Article III of the United States Constitution gives federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part."  *Hooker v. Sasser*, 893 F.Supp. 764, 766 (M.D.Tenn. 1995)(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 363-64 (1992)).  A party seeking to invoke this Court's jurisdiction must establish the necessary standing to sue before this Court may consider the merits of that party's cause of action.  *Whitmore v. Arkansas*, 495 U.S. 149, 154, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135, 144-45 (1990).

The United States Supreme Court has set forth the three elements which comprise "the irreducible constitutional minimum of standing": (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal connection between the injury and the challenged conduct; and, (3) it must be likely that a favorable decision will remedy the injury. *Hooker v. Sasser*, 893 F.Supp. at 766-67 (citing *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136, 119 L.Ed.2d at 364). *See also Froelich v. Federal Election Com'n*, 855 F.Supp. 868, 869 (E.D.Va. 1994). Furthermore, an injury in fact must consist of "an invasion of a legally-protected interest" which is "concrete and particularized," as well as one which is actual or imminent and not simply "conjectural" or "hypothetical." *Id.*

The primary focus of a standing inquiry is on the party, not on the merits of the claim. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982) and *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Although standing does not depend on the merits, it often runs on the nature and source of the claim asserted and, therefore, a standing inquiry requires a "careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. at 752, 104 S.Ct. at 3325. *See also, Curve Elementary Sch. Parent and Teacher's Org. v. Lauderdale County Sch. Bd.*, 608 S.W.2d 855, 858 (Tenn. Ct. App. 1980)("[I]t is both appropriate and necessary to look to the substantive issues . . . ."). Furthermore, when the claimed injury involves the violation of a statute, the court must determine "whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in

the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

In addition to the constitutional requirements, federal courts have established certain prudential principles that affect standing. *Froelich v. Federal Election Com'n*, 855 F.Supp. at 869 (citations omitted).  Thus, Courts have refused to adjudicate "abstract questions of wide public significance" that amount to "generalized grievances" shared by many and which are more appropriate for resolution by Congress. *Warth v. Seldin*, 422 U.S. 490, 499-500, 95 S.Ct. 2197, 2205-06, 45 L.Ed.2d 343 (1975).

## 1.  Injury in Fact

The Plaintiffs in this case have not suffered a distinct and palpable injury, and thus fail in the first prong of establishing standing.

To establish standing, the complainant must first clearly demonstrate that he has suffered an injury in fact.  That injury must be concrete and palpable in both a qualitative and temporal sense.  The complainant must allege an injury to himself that is distinct and palpable, and not abstract, and the alleged harm must be actual or imminent, not hypothetical or conjectural. *McConnell v. Federal Election Com'n*, 540 U.S. 93, 225 (2003) (citations omitted); *Wissman v. Pittsburgh Nat'l Bank*, 942 F.2d 867, 871 (4th Cir. 1991)("In order to have standing to pursue an action, a plaintiff must have a present, substantial interest, as distinguished from a mere expectance or future, contingent interest.").

Here, the Plaintiffs allege that their rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment and Section 2 of the Voting Rights Act will be violated *if* the Senate voids the Special Election of Ms. Ford.   Plaintiffs do not claim to have suffered a

distinct and palpable harm that has actually occurred or that is actual or imminent.  Indeed,

Plaintiffs admit that the actions of the Senate they complain of are nothing more than "proposed"

actions[5]  (Amended complaint at 10).   The admission that no action has been taken by the

Senate standing alone establishes that Plaintiffs have not suffered any harm.

Furthermore, with respect to the plaintiff voters, the amended complaint specifically

alleges that each of these individuals voted in the Special Election in District 29 on September

15, 2005.  *See* Amended complaint at ¶ 2-4.  The amended complaint does not allege, however,

that the votes of these individuals were not counted by the Shelby County Election Commission

when it certified the election results to the State Coordinator of Elections.  *See* Amended

complaint at ¶ 2.  The amended complaint does allege that the votes of these individuals fall into

one of the four categories of votes being challenged or questioned by Mr. Roland, but that there

is only the potential harm of having their votes invalidated.

The amended complaint also alleges that the plaintiff voters will be "indirectly"

disenfranchised along with all of the voters of Senate District 29 if the election is voided.  *See*

Amended Complaint at ¶ 21.  This form of injury is not distinct and personal to the Plaintiff

voters; instead, it is both abstract, and according to the Amended complaint, shared by all of the

voters of Senate District 29. In *Schlesinger v. Reservatists Committee to Stop the War*, the

Supreme Court stated:

> [S]tanding to sue may not be predicated upon an interest of the
> kind alleged here, which is held in common by all members of the
> public, because of the necessarily abstract nature of the injury all
> citizens share.  Concrete injury, whether actual or threatened, is

---

[5]Plaintiffs may argue that the harm is imminent, but that argument is unpersuasive. The actions of
individual Senators are very unpredictable on a day by day basis and can change quickly based on newly uncovered
facts as well as public opinion.

> that indispensable element of a dispute which serves in part to cast
> it in a form traditionally capable of judicial resolution.

418 U.S. 208, 220-21, 94 S.Ct. 2925, 2931-32, 41 L.Ed.2d 706 (1974).  The province of this

Court is, solely, to decide on the rights of **individuals**,  *Marbury v. Madison*, 5 U.S. (1 Cranch)

137, 170, 2 L.Ed. 60 (1803), and the Supreme Court has consistently held that a plaintiff raising

only a generally available grievance claiming harm to his and every citizen's interest in proper

application of the Constitution and laws, and seeking relief that no more directly and tangibly

benefits him than it does the public at large does not state an Article III case or controversy.  *See*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. at 2143-45.  *See also*, *Allen v. Wright*,

468 U.S. 757, 104 S.Ct. 3315, 3326 (1984) and *Valley Forge Christian College v. Americans*

*United for Separation of Church and State, Inc., 45*4 U.S. 464, 483, 102 S.Ct. 752, 764, 70

L.Ed.2d 700 (1982).

Accordingly, both Ms. Ford and the individual Plaintiff Voters have failed to meet the

first prong in order to establish standing necessary to bring this cause of action.

**2.      Plaintiffs cannot trace the injury complained of to any individual Senator.**

Assuming *arguendo* that Plaintiffs can establish injury in fact, they cannot trace the

injury complained of to any individual Senator, because no one Senator can bind the whole

Senate with his or her vote.  This inability to trace any alleged injury to any named Defendant is

fatal to Plaintiffs' ability to establish standing.

As discussed, *supra*, the second prong of the standing inquiry is whether there is a causal

connection between the injury complained of and the conduct complained of - the injury must be

traceable to the challenged action of the defendant.  *McConnell v. Federal Election Com'n,*. 540

U.S. at 225;  The conduct Plaintiffs complain of is the voiding of the Special Election by the

Senate.  However, as Plaintiffs themselves admit, this event has not yet occurred and may never occur.  Thus, at this time, Plaintiffs cannot trace their alleged harm to any conduct of the Defendants and, therefore, cannot establish standing.  *See Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1176 (D.C.Dir. 1986)("[T]he mere possibility that causation is present is not enough; the presence of independent variables between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied.")

Moreover, even if the conduct took place, *i.e.*, the Senate voided the election, any alleged harm resulting therefrom cannot be trace to any individual Senator, nor any conduct that any individual Senator is capable of performing.  The only conduct each Senator is capable of is voting their one vote, and no one vote alone could void the election.  Thus, the voiding of the election is not traceable to every individual Senator - especially assuming that some Senators will not vote to void the election.[6]

Furthermore, this argument assumes that those Senators who vote to void the election do so based upon impermissible/unconstitutional grounds.   However, some Senators may vote to void the election for completely permissible/constitutional reasons while others may vote for impermissible/unconstitutional reasons.  In this situation, the first group of Senators would not have violated the Plaintiffs' rights secured by federal guarantees to Equal Protection, Due Process, or the Voting Rights Act, while the second group may have violated these rights.  Both

---

[6]This concept is evidenced by the fact that Ms. Ford is not a named Defendant in this action.  There is no question that she is as capable of the alleged harm as any of the other 32 Senators.  This concept if further evidenced by the fact that the amended complaint itself divides the individual Senators into two categories of Defendants, only asserts allegations of Voting Rights Act violations against one category (*i.e.*, the Senators who voted in favor of Proposed Senator Resolution 7002).  *See* Amended complaint at ¶¶ 5-6.

the Plaintiffs and this Court would be incapable of separating the two groups, however, because

the Defendant Senators may not be required to testify regarding their legislative actions.[7]  *See*

*Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (Supreme Court held that in order to effectuate

the purposes of the doctrine of legislative immunity, legislators "should be protected not only

from the consequences of litigation's results, but also from the burden of defending themselves);

*Schlitz v. Commonwealth of Virginia*, 854 F.2d 43, 46 (4th Cir. 1988) ("[t]he purpose of the

doctrine is to prevent legislators from having to testify regarding matters of legislative conduct,

whether or not they are testifying to defend themselves.).[8]

### C. *YOUNGER* ABSTENTION DOCTRINE REQUIRES THIS COURT TO REFRAIN FROM EXERCISING JURISDICTION OVER ALL CLAIMS BY SEN. FORD.

In *Younger v. Harris*, the Supreme Court recognized the notion of comity between the

federal and state governments.  The Court stated that comity requires, "a proper respect for the

state functions, a recognition of the fact that the entire country is made up of a Union of separate

state governments, and a continuance of the belief that the National Government will fare best if

the States and their institutions are left free to perform their separate functions in their separate

ways."  401 U.S. 37, 44 (1971).  The Court reasoned, "[w]hat the concept does represent is a

---

[7]This problem not only touches on the doctrine of standing, but also on ripeness described above.  Until this Court could see which Senator voted which way and unless there was a complete record of why each voted the way they did, this action will be inappropriate for adjudication.

[8]In determining whether a particular task is in the sphere of legitimate legislative activity, the Supreme Court has looked to whether the activities are "an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislative or with respect to other matters which the Constitution places within the jurisdiction of either House."  *Eastland*, 421 U.S. at 503.  It is undisputed that the judging of the elections of its members is placed solely within the jurisdiction of the Tennessee State Senate.  *See* Art. II, § 12, Tennessee Constitution.  *See also Larsen v. Senate of the Commonwealth of Pennslyvania*, 152 F.3d 240 (3rd Cir. 1998).

system in which there is sensitivity to the legitimate interests of both State and National

Governments, and in which the National Government, anxious though it may be to vindicate and

protect federal rights and federal interests, always endeavors to do so in ways that will not

unduly interfere with the legitimate activities of the States." *Id.*   Based upon this concept, the

Supreme Court recognized the general rule that the federal courts should not enjoin state

criminal prosecutions.  *See id.* at 45.

The Supreme Court has since extended *Younger*, finding that federal courts should not

enjoin state administrative proceedings.  *See Ohio Civil Rights Comm'n v. Dayton Christian

Schs., Inc.*, 477 U.S. 619 (1986) (holding that *Younger* applied to a sex discrimination claim

before the Ohio Civil Rights Commission); *Middlesex County Ethics Comm. v. Garden State Bar

Ass'n*, 457 U.S. 423 (1982) (holding that *Younger* applied to a New Jersey Bar Association

Ethics Commission proceeding).  The Court of Appeals for the Sixth Circuit and district courts

in this circuit have also applied *Younger* to suits filed against state and local election

commissions in election contests.  *See Citizens for a Strong Ohio v. Marsh*, 123 Fed.Appx. 630,

(6th Cir. 2005); *Chamber of Commerce of the United States v. Ohio Elections Comm'n*, 135

F.Supp.2d 857 (S.D.Ohio 2001); *Walter v. Cincione, No. C-2-00-1070*, 2000 WL 1505945

(S.D.Ohio Oct.6, 2000).

Per *Younger* and its progeny in this circuit, a federal court must engage in a three part test

to determine if abstention is required.  *Fieger v. Thomas*, 74 F.3d 740, 743 (6th Cir. 1996) (citing

*Middlesex*, 457 U.S. at 432).  First, the court must determine if there is an ongoing state judicial

proceeding.  *Id.* at 744.  Second, the court "must find that the state has an important interest in

18

regulating the subject matter of the claim." *Id.* at 745. Third, there must be "an adequate

opportunity in the state proceedings to raise constitutional challenges." *Id.*

The case before this court satisfies the three part abstention test, and as a result, this court

should abstain from considering Ms. Ford's claims.

**1.      There is an ongoing state judicial proceeding in the Tennessee  Senate.**

Article II, Section 11 of the Tennessee Constitution provides that

> The senate and house of representatives, when assembled shall
> each choose a speaker and its other officers, be *judges* of the
> qualifications and election of its members, and sit upon its own
> adjournments from day to day. . . .

Pursuant to this constitutional provision, the Tennessee General Assembly enacted Tenn. Code

Ann. § 2-17-102, which provides that election contests for the office of State Senator shall take

place in the State Senate.  Other provisions in the state election laws make it clear that the Senate

is acting as a quasi-judicial tribunal in judging the qualifications and elections of its members.

*See e.g.*,  Tenn. Code Ann. § 2-17-117.

Furthermore, this Court can make a determination that the proceedings are judicial in

nature based upon the Supreme Court's reasoning in *New Orleans Public Service, Inc. v. Council

of the City of New Orleans*.  491 U.S. 350 (1989).  There, the Court held that the nature of the

final act was determinative of whether a proceeding was judicial in nature.  *Id.* at 371.  "A

judicial inquiry investigates, declares and enforces liabilities as they stand on present or past

facts and under laws supposed already to exist. That is its purpose and end." *Id.* at 370-71

(citations omitted).  The inquiry here will lead to findings of fact and a final determination based

on election law of the validity of votes and/or the election.

19

Here, the Senate and its Special Ad Hoc Committee have been conducting debate and holding hearings to gather facts and make a determination considering the validity of the Special Election in District 29.  Accordingly, these proceedings clearly are judicial in nature and, therefore, satisfy the first prong of the *Younger* test.[9]

**2.       The state has an important interest in regulating the subject matter of the claim.**

The Sixth Circuit has held that when inquiring "into the substantiality of the State's interest in its proceedings we do not look narrowly to its interest in the outcome of the particular case--which could arguably be off-set by a substantial federal interest in the opposite outcome. Instead what we look to is the importance of the generic proceedings to the state."  *Sun Refining & Marketing Company v. Brennan*, 921 F.2d 635, 641 (6th Cir. 1990) (quoting *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 2516, 105 L.Ed.2d 298 (1989)). Clearly the Tennessee State Senate has a significant, constitutional interest in judging the qualifications and elections of its members, while the State of Tennessee, as a whole, has a significant interest in the conduct of state elections.  These important interests satisfy the second prong of the *Younger* test.

The *Fieger* court found that the State of Michigan had a great interest in regulating the conduct of attorneys in the state.  The plaintiffs in *Fieger* argued that because the challenge at issue posed a constitutional challenge to the substance of the rules of professional conduct as

---

[9] There is some question of whether or not this Court would need to even find that there is an ongoing judicial proceeding at the state or local level because the Supreme Court has extended Younger to purely administrative proceedings.  *See Ohio Civil Rights Comm'n v. Dayton Christian Sch.*, 477 U.S. 619, 627 (1986).  The Supreme Court applied Younger abstention to "state administrative proceedings in which important state interests are vindicated" where "in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim."  *Id.*  The Court rejected the argument that the administrative proceedings would not adequately afford the opportunity to raise constitutional claims.  The Court stated, "it is sufficient ... that constitutional claims may be raised in state-court judicial review of the administrative proceedings."  *Id.* at 629.

well as the procedures adopted to enforce them, the federal courts were a more appropriate forum to adjudicate those claims. *Fieger*, 74 F.3d at 745. The court, however, found that not only does the complicated and generally federal nature of the challenge not argue against abstention, but, it, in fact, counsels in favor of abstention. *Id.* The court further reasoned that the policies of comity and federalism demand that because Michigan has such an important interest in regulating its own bar, a state forum should have the first opportunity to review the rules of lawyer conduct and procedures for lawyer discipline. *Id.* (citing *Middlesex*, 457 U.S. at 432-35). The court also stated that federal courts have increasingly accepted the idea that state tribunals are competent to adjudicate federal constitutional questions. *Id.* (citing *Middlesex*, 457 U.S. at 436).

Just as in *Fieger*, the issues here are complicated and generally federal in nature. Also as in *Fieger*, Tennessee has a very important interest in the results of any such challenge. Finally, just as in *Fieger*, all of this argues in favor of allowing the Senate - the tribunal empowered by state law to consider the standards and merits of an election contest - to have the first opportunity to examine and resolve the issues prior to federal involvement.

### 3.   There will be an adequate opportunity in the state proceedings to raise constitutional challenges.

"[A]bstention is appropriate unless state law clearly bars the interposition of the constitutional claims." *Moore*, 442 U.S. at 425-26. In addition, the burden of proving that the federal plaintiffs would not have an adequate opportunity to present their constitutional claims in the state proceeding rests on the federal plaintiffs. *Id.* at 432.

It is undisputed that Ms. Ford has had and will continue to have an adequate opportunity to present her constitutional challenges in front of the Senate Ad Hoc Committee assigned to

investigate this election contest, and likely in front of the full Senate as well.[10]  Furthermore, there is no proof that the Defendants will bar Ms. Ford from presenting her constitutional claims before the entire Senate.  Nor has Senator  Ford pled that the Defendants will bar any presentation relating to the constitutional issues .[11]  Thus, this opportunity satisfies the third and final prong of the *Younger* test.  Accordingly, this Court should abstain from interfering with the ongoing election contest before the Tennessee Senate — a process singularly committed to the Senate by the Tennessee Constitution.

### D.  FEDERAL INTERVENTION IN THIS CASE IS IMPROPER UNDER THE PRINCIPLES OF FEDERALISM.

The right to vote is a "fundamental political right, . . . preservative of all rights.  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  However, "[p]rinciples of federalism limit the power of federal courts to intervene in state elections."  *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2nd Cir. 2005) (quoting *Burton v. Georgia*, 953 F.2d 1266, 1268 (11th Cir. 1992).  The United States Constitution anticipates that the electoral process is to largely controlled by the states and reviewed by the legislature, *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980), and the Supreme Court has "recognized that the States 'have long been held to have broad powers too determine the conditions under which the right of suffrage may be exercised.'" *Shannon v.*

---

[10]This relates back to the ripeness problem discussed above.  Neither the Plaintiff nor the Defendant can know to a certainty what evidence will be allowed in front of the full Senate or in front of the Special Ad Hoc Committee.  The Special Ad Hoc Committee has scheduled a hearing for Tuesday, January 26, 2006.  Both parties have been invited to present evidence at the hearing.

Neither party knows if, after receiving the report and recommendation of the Ad Hoc Committee, the full Senate will invite the parties in for a full hearing with evidence to be presented.

[11]In fact, there is evidence that, in addition to the opportunity to be heard on January 26, 2006, Ms. Ford and her representatives spoke at two prior Ad Hoc Committee meetings, at which time they were free to raise any Constitutional arguments.

*Jacobwitz*, 394 F.3d at 94 (citations omitted).  Because the states traditionally have authority

over their own elections and because the Constitution contemplates that authority, courts "have

long recognized that not every state election dispute implicates federal constitutional rights."

*Burton v. Georgia*, 953 F.2d at 1268.  "Only in extraordinary circumstances will a challenge to a

state election rise to the level of a constitutional deprivation."  *Curry v. Baker*, 802 F.2d 1302,

1314 (11th Cir. 1986).  Consequently, the federal courts' role has primarily been to address the

general application of law and procedures, not the particulars of election disputes.  *See, e.g.,*

*Dunn v. Blumstein*, 405 U.S. 330 (1972) (durational residence requirements); *Harper v. Virginia*

*Board of Elections*, 383 U.S. 663 (1966) (poll tax); *Carrington v. Rash*, 380 U.S. 89 (1965)

(restriction on voting rights of servicemen); *Avery v. Midland County*, 390 U.S. 474 (1968)

(dilution of votes through malapportionment).  Intervention "has tended, for the most part, to be

limited to striking down state laws or rules of general application which improperly restrict or

constrict the franchise" or otherwise burden the exercise of political rights.  *Griffin v. Burns*, 570

F.2d 1065, 1076 (1st Cir. 1978).

  With respect to election contests, federal courts have recognized that they are ill-

equipped to monitor the details of elections and resolve factual disputes born of the political

process.

> Were we to embrace plaintiff's theory, this court would
> henceforth be thrust into the details of virtually every election,
> tinkering with the state's election machinery, reviewing petitions,
> election cards, vote tallies, and certificates of election for all
> manner of error and insufficiency under state and federal law.

*Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970).  As the courts have noted, elections are not

always free from error and defeated candidates and their supporters are often inclined to view

these mutlifarious opportunities for human error in a less than charitable light.  *Hutchinson v. Miller*, 797 F.2d 1279, 1286-87 (4th Cir. 1986).  Thus, even apart from the principles of federalism, federal courts have found that

> sifting the minutiae of post-election accusations is better suited to factual review at the administrative and legislative level, where an awareness of the vagaries of politics informs the judgment of those called upon to review the irregularities that are inevitable in elections staffed largely by volunteers.

*Id*. (citing *Hennings v. Grafton*, 523 F.2d 862, 865 (7th Cir. 1975)).

Thus, only in a few narrow and well-defined exceptions has a federal court injected itself into a state or local election contest.  *See Bonas v. Town of North Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001).  The first justification for federal intervention is when a discrete group of voters is denied the right to vote or is disenfranchised.  *Id.*  In these circumstances, the court should examine whether there is a state process in place to handle the election contest and whether the complainants availed themselves of this process before imposing federal remedies.  *Id.*  The second justification for federal intervention is when the election process itself is patently and fundamentally unfair, such as when the governing body changes what constitutes a valid vote after the ballots are cast.  *Id.*   Otherwise, for the reasons discussed *supra*, there is a heavy presumption in favor of non-intervention.  *Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 16 (1st Cir. 2005).

*Rossello-Gonzalez* concerned an election contest in the gubernatorial race in Puerto Rico. Id at 4-5.  There was some question of how the ballots should be judged.  The First Circuit held that federal intervention was improper as long as all the ballots were judged by the same

standards, and those standards had not changed from prior to the election.[12]  *Id.* at 16.

Consequently, there was found to be no discrete set of voters disenfranchised from the

application of those standards.

Here, just like in *Rossello-Gonzalez*, there is no discrete set of voters that will be

disenfranchised.  Assuming that the Senate does vote to void the Special Election, every voter in

that election will have been treated identically.  In addition, there is no evidence of the

imposition of a change in the standard for judging ballots in the District 29 Senate Special

Election after the ballots were cast.  Finally, even if there were a discrete group of voters

affected, there is a process in place in the State Senate to handle election contests, and the

Plaintiffs in this case have not fully availed themselves of that process - as the Senate has yet to

render a final decision.  Accordingly, there is no basis for this Court to take the exceptional step

of intruding in the ongoing election contest in the State Senate, where there is no evidence that a

discrete group of voters will be disenfranchised by that legislative body.

The next question a court must ask is whether the election process was so fundamentally

and patently unfair as to warrant federal intervention.  This exception is simply not present in

this case.  Here, Plaintiffs are not alleging that the election process itself was fundamentally and

patently unfair.  Indeed, Plaintiffs are quite satisfied with the election itself and seek to have it

upheld.  Rather, it is Mr. Roland, the unsuccessful candidate, who has raised issues with the

election process - alleging such irregularities in the conduct of that election that mandates a

voiding of the election.  Thus, Plaintiffs' amended complaint simply does not present that

situation where the election process was so fundamentally and patently unfair as to warrant

---

[12]In fact, the court noted that there was no standard before the election, and establishing a standard after did not implicate Equal Protection problems.  *Id*. at fn. 29.

25

federal intrusion, particularly intrusion in the form of an order enjoining the Senate from performing its constitutional duties in judging the election of its members.[13]

Finally, the other cases cited by Plaintiffs in support of their position that federal intervention in this state election contest is warranted are simply not applicable. In *Roe v. State of Alabama*, 43 F.3d 574 (11th Cir. 1995), a number of absentee ballots case in a general election for several statewide offices were not counted pursuant to statutory mandate. Following the election, two individuals who had voted by absentee ballot filed suit in state court seeking an order that the contested absentee ballots be counted. The state court issued an order requiring the ballots be counted in that county. Thereafter, another voter and the Republican candidates filed suit in federal court and obtained a preliminary injunction enjoining the election officials in the sixty-seven counties from complying with the state court's order, based upon the statutory mandate, as well as the state-wide practice prior to the election of not counting such ballots. The Eleventh Circuit held that federal intervention was appropriate because the failure to exclude the contested absentee ballots in accordance with the state court's ruling would constitute a post-election departure from previous practice in Alabama. *Id*. at 581. Interestingly, in a subsequent appeal, the Eleventh Circuit held that the refusal to count the contested absentee ballots did not deny contested ballot voters due process or equal protection. *Roe v. Alabama*, 68 F.3d 404, 407-08 (11th cir. 1995).

A similar situation was presented in the other case cited by Plaintiffs, *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978). In that case, state election officials had publicly offered absentee

---

[13]It should be noted that the holding of another election is generally the remedy for election contests that warrant federal intervention, not an order declaring a party to be the successful candidate. *See Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981); *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978).

and shut-in ballots to voters in a primary election.  After the election, an unsuccessful candidate challenged the use of such ballots in the primary election.  The Rhode Island Supreme Court ultimately ruled that there was no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election and ordered that any such ballots be invalidated.  The absentee and shut-in voters then brought suit in federal court.  The district court held that the state's retroactive invalidation of absentee and shut-in ballots violated those voters' due process rights and ordered that a new primary be held.  The First Circuit upheld this federal intervention and the remedy of ordering a new primary.  In doing so, the court specifically stated that intervention was appropriate because it "was not asked to examine the validity of individual ballots or to supervise the administrative details of a local election.  It was asked to remedy a broad-gauged unfairness the infected the results of a local election."  *Id*. at 1078.

Here, that is exactly what plaintiffs are asking this Court to do — to examine the validity of individual ballots and/or supervise the administrative details of a local election.  In fact, plaintiffs go so far with the request for injunctive relief as to have this Court establish the standards of conduct by which the Defendants Senators must act in this election contest.  Clearly such federal intervention in the State Senate is simply not warranted under facts in this case and under the principles of federalism.[14]

**E.  THE EQUAL PROTECTION CLAIMS MADE BY PLAINTIFFS ARE WITHOUT MERIT BECAUSE EVERY VOTE IN THE ELECTION CONTEST IS BEING JUDGED BY THE SAME STANDARDS AND TREATED EQUALLY.**

---

[14]The Court should also consider that even if some elements of the process up to this point have been defective, the fact that the process is not over should prevent federal intervention as the Senate could still cure any deficiencies.

In *Bush v. Gore*, the Supreme Court ruled that the Equal Protection clause requires that all ballots in an election be judged by the same standards so as not to selectively disenfranchise one group of voters. 531 U.S. 98, 105-06 (2000). *Bush v. Gore* arose out of the 2000 presidential election. After an initial count of votes showed a thin margin of victory for then Gov. Bush, then Vice President Gore filed an election contest in Florida state court. *Id.* at 102-03. After several appeals, the Florida Supreme Court held that the ballots should be recounted and should be judged by the apparent intent of the voter.[15] *Id.* at 106. During the recount ordered by the Florida Supreme Court, it became apparent that different poll workers were judging ballots by different standards. This inequality of judgment of the ballots led to the Supreme Court's finding of an equal protection violation. *Id.* at 105-06.

The situation before this Court is distinguishable from than that in *Bush v. Gore*. The Supreme Court's concern that ballots are not being judged uniformly is not implicated in the Special Election for the 29th District. Here, all ballots from all precincts in District 29 are being judged uniformly.[16] Plaintiffs have not alleged any such disparate treatment within the election. Thus, no *Bush v. Gore* type Equal Protection argument is possible.

Plaintiffs' other Equal Protection arguments, stemming from prior case precedent, are all based on the idea that standards for voiding a vote must be appropriately defined and uniformly

---

[15]At that time, Florida used punch through ballots, in which the voter punched a hole next to the name of the candidate they wished to vote for. It appeared after the election that some ballots were not punched through all the way. Some ballots had been punched enough to make a tear, but the "chad" or the perforation had not been completely torn (resulting in a hanging chad). Some ballots had indentations in the chad, but the paper was not torn at all.

[16]As a threshold issue, no final judgment on any ballot cast in the Special Election has been made. Thus, neither Plaintiff nor Defendant knows what standard will be applied. This leaves Defendants in the precarious position of defended actions not yet taken, and Plaintiffs in the precarious position of alleging, with specificity, violations that have not taken place.

applied.  Plaintiffs assert that the standards being applied to this election contest are more rigid

than those applied across the state.  This comparison is inherently defective.  Here the Senate is

considering an election contest to a special election.  In any election contest, the standards for

examining votes will always be more rigid than the standards in an uncontested election.[17]  The

proper comparison for any Equal Protection claim would be between this election contest and

prior election contests.  Given that there has been no non-uniformity in application here versus

past election contests, there can be no plausible Equal Protection claim.  Indeed, given that no

votes have been voided, there can be no claim of non-uniformity in the application of standards.

Also under the auspices of Equal Protection, Plaintiffs claim that the Senate has violated

federal law by choosing to pursue the election contest claims of one political party with more

rigor than the other.  Given the almost even split of the political  make up of the Senate, this

scenario seems highly unlikely, and no evidence other than the conclusory claim is presented in

support of it.

In short, Plaintiffs' amended complaint simply fails to sufficiently allege or establish a

claim of violation of their rights under the Equal Protection Clause and such claims should be

dismissed.

### F.  PLAINTIFFS HAVE NOT ALLEGED SUFFICIENT FACTS TO SUPPORT A CLAIM THAT DEFENDANTS VIOLATED SECTION 2 OF THE VOTING RIGHTS ACT OF 1965, AND THUS ANY SUCH CLAIM SHOULD BE DISMISSED.

Section 2 of the Voting Rights Act of 1965 provides that:

---

[17]In uncontested elections, it makes sense to assume that all votes cast by registered voters are valid.  This presumption, however, is different in an election contest.  By virtue of the issues in an election contest, a closer examination of votes is required.  The Due Process that Plaintiffs seek demands such a heightened scrutiny.

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. 1973.

Plaintiff has not, and cannot, plead that there was any "qualification or prerequisite to voting or standard, practice, or procedure voting" that unfairly burdened a protected class of citizens. Section 2 of the Voting Rights Act was enacted to outlaw racial discrimination in voting at a time when many states had statutes enacted solely to prevent minority groups from voting. *State of S.C. v. Katzenbach*, 383 U.S. 301, 308 (1966). It was used primarily to strike down any qualification / Jim Crow laws prior to 1982. It was amended in 1982 after the marked decline in overtly racially motivated laws preventing minorities from voting and since then has been primarily used to strike down more subtle schemes that result in voter dilution of minorities.

Here, no such scheme has been alleged.  There are no racially motivated qualification laws, nor are the Plaintiffs' alleging a voter dilution scheme (through re-districting or otherwise). The Plaintiffs' attempt to analogize the situations in *Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978), and *Ortiz v. Philadelphia Voter Registration Division*, 28 F.3d 306 (3rd Cir. 1994), is misguided and confuses the facts in those cases with the facts before this Court.

The *Shepherd* court was asked to consider a Texas law which allowed for the re-enfranchisement of convicted state felons who completed their probation but not convicted felons who completed federal probation.  *Shepherd*, 575 F.2d at 1111.  The court found no equal protection violation in this scheme and upheld it as valid.  *Id.* at 1114.

Plaintiffs here seem to rely on *dicta* in the decision where the court stated that had the Texas law, instead of providing for re-enfranchisement of state felons who completed state probation, provided for re-enfranchisement of white felons who completed probation, then the statute would be unconstitutional.  *Id.*  This reasoning is inapplicable here, as no minorities were denied the right to vote, no minorities are being disparately impacted by any law governing voting, and any proposed disenfranchisement would affect the whole of Senatorial District 29, not just the minority members.

The *Ortiz* case is similarly inapplicable.  The court in that case was faced with a Pennsylvania voter purge statute that purged the registration of all voters who had not voted within the last two years.  28 F.3d at 307.  The court upheld the statute as constitutional and not violative of the Voting Rights Act.  *Id.* at 317-18.  Again, this case in inapplicable to the situation here because, just as in *Shepherd*, *Ortiz* deals with a statute that affects rights to vote

31

determined before an election.  In the case before this Court, there is no allegation of a

qualifying statute that barred any member of the electorate from voting.

The Voting Rights Act gives minorities a cause of action for racially motivated denial of

the right to vote as evidenced by the opening statement of Section 2; it does not give a cause of

action for post election contests where no member of the electorate has been denied the right to

participate fully in the election process itself.  Moreover, as previously discussed, the amended

complaint specifically alleges that the individual plaintiff voters *voted* in the Special Election in

District 29, and more importantly, the complaint does not allege that the votes of these plaintiffs

were not counted.  Consequently, Plaintiff's amended complaint simply fails to state a claim for

violation of Section 2 of the Voting Rights Act.[18]

### G.  PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF SECTION 1971 OF THE VOTING RIGHTS ACT AS THIS SECTION ONLY APPLIES TO THE REGISTERING OF VOTERS AND NOT THE COUNTING OF VOTES.

Section 1971(a)(2)(B) of the Voting Rights Act provides that no official acting under

color of state law shall:

> deny the right of any individual to vote in any election because of
> an error or omission on any record or paper relating to any
> application, registration, or other act requisite to voting, if such
> error or omission is not material in determining whether such
> individual is qualified under State law to vote in such election.

In their amended complaint, Plaintiffs state that the Senate proposes to disqualify the votes of a

discrete group of voters who failed to sign both the application for ballot and the poll book when

the voted in the Special Election.  They assert that this "proposal to disqualify such voters for

_____

[18]Plaintiff Ms. Ford has no standing to sue under the Voting Rights Act.  *See White-Battle v. Democratic Party of Virginia*, 323 F.Supp.2d 696, 702 (E.D. Va. 2004) (citations omitted).

failure to double-sign violates Section 1971," because the requirement to sign both the application and the poll book is not "material" in determining the person's voting eligibility.

In asserting this cause of action, the plaintiff voters rely primarily upon the case of *Schwier v. Cox*, 340 F3d. 1284 (11th Cir. 2003), in which the Eleventh Circuit found that individual voters have a private right of action to enforce Section 1971.  In that case, the plaintiffs had attempted to register to vote in Georgia, but were told that they would not be allowed to *register* unless they provided their social security numbers.  They then filed suit alleging that the requirement of social security numbers in order to register to vote violated Section 1971(a)(2)(B).

In determining that the plaintiffs had a private right of action to enforce Section 1971, the court specifically stated that "this provision was intended to address the practice of requiring unnecessary information for ***voter registration*** with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify ***potential voters***."  *Id*. at 1294 (citing *Condon v. Reno*, 913 F.Supp. 946, 949-50 (D.S.C. 1995)).  Cases from other jurisdictions alleging violations of Section 1971(a)(2)(B) have similarly focused on whether the information required was relevant or "material" to determining elibility to register to vote.  *See, e.g., Hoyle v. Priest*, 265 F.3d 699, 704 (8th Cir. 2001); *Howlette v. City of Richmond, Virginia*, 485 F.Supp. 17, 21-22 (E.D.Va. 1978).  However, none of these cases has indicated that Section 1971(a)(2)(B) was intended to apply to the counting of ballots by individuals already deemed qualified to vote.  Indeed, at least one court has held, based upon the plain language of the statute, that Section 1971(a)(2)(B) does not apply to the

counting of votes, but to determining eligibility to vote.  *See Friedman v. Snipes*, 345 F.Supp.2d 1356, 1372 (S.D.Fla. 2004).

Here, plaintiffs do not allege that they were prohibited from registering to vote because of an error or omission on any record or paper.  Indeed, it is obvious from the complaint that plaintiffs were both registered to vote and did in fact vote in the Special Election.  Instead, what the plaintiff voters contend is that the Senate *will* violate Section 1971(a)(2)(B) if they do not count their ballots because of the failure to "double-sign".  In other words, the plaintiff voters would have this Court read Section 1971 as "an error or omission on any record or paper or any error or omission in the treatment, handling, or counting of any record or paper."  However, as the court in *Friedman* noted, the plain meaning of Section 1971(a)(2)(B) simply does not support such an expansive interpretation.  *Id.*  Accordingly, as the amended complaint does not allege that plaintiffs were prevented from registering to vote due to any error or omission on any record or paper, Plaintiffs fail to state a claim for violation of Section 1971(a)(2)(B) and, therefore, such claims should be dismissed.

## H.  PLAINTIFFS HAVE NO VIABLE DUE PROCESS CLAIM, AND EVEN IF THEY HAD ONE, IT HAS BEEN MOOTED BY THE MEETING OF THE SPECIAL AD HOC COMMITTEE ON JANUARY 24, 2006.

Plaintiffs allege that their Constitutionally guaranteed right to Due Process will be violated by the proposed actions of the Senate.  As an initial matter, every Due Process claim must be rooted in a deprivation by the state. To establish a property interest in a particular benefit, a plaintiff must have a "legitimate claim of entitlement to it."  *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).  For purposes of the Due Process clause, a property interest is not created by the Fourteenth Amendment, but rather by

"existing rules or understandings that stem from an independent source such as state law, rulings or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.  See also, McLauren v. Fischer*, 768 F.2d 98, 102 (6th Cir. 1985)(citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Goss v. Lopez*, 419 U.S. 565, 572-73, 95 S.Ct. 729, 735-36, 42 L.Ed.2d 725 (1975)). *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972)(an interest is "property" under the Fourteenth Amendment "if there are such rules or mutually explicit understandings that support [a] claim of entitlement . . . ."). Moreover, a property interest does not exist solely because of the importance of the benefit to the recipient. Nor is the "unilateral expectation" of continued receipt of the benefit sufficient to establish a property interest. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

Thus, in determining whether Plaintiffs have a protected property right, this Court should "focus initially on the relevant statute, regulation, or contract establishing eligibility for the government [right] at issue." *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 581 (2d Cir. 1989). If the statute, regulation or contract in issue vests in the state significant discretion over the continued conferral of that right or benefit, then the courts have rarely found that the recipient can establish an entitlement to that benefit. *Id. See also RR Village Ass'n v. Denver Sewer Corp.*, 826 F.2d 1197, 1201-02 (2d Cir. 1987).

Here, Ms. Ford simply cannot establish that she has any liberty or property interest in being seated in the Tennessee Senate that arises under state law, because the Tennessee Constitution vests in the Senate the sole and exclusive authority to judge the election and

qualifications of its members.  For the same reason, the voter plaintiffs cannot establish any liberty or property interests in having their candidate, Ms. Ford, seated in the Tennessee Senate.

Moreover, the Supreme Court has held "that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327 (1986).  Thus, within the context of elections, federal courts have held that a finding of intentional conduct is a prerequisite for a due process claim and that the Due process clause "offers no guarantee against errors in the administration of an election." *Powell v. Power*, 436 F.2d at 88.  Thus, even if Ms. Ford had a protected property interest, Plaintiffs have neither alleged nor established that any deprivation, much less intentional deprivation, has occurred.   Accordingly, Plaintiffs' due process claims must fail.

Finally, it does not seem plausible that Plaintiffs could support any procedural Due Process claim given that no party to this litigation can claim that they have not had notice of the election contest nor can Plaintiffs claim that they have not had the opportunity to be heard - especially in light of the invitation to the Special Ad Hoc Committee meeting on January 24, 2005.  Due to Plaintiffs' lack of ability to point to any property interest, any state action, any deprivation, or any lack of notice and a hearing, the Court should dismiss all Due Process claims.[19]

## I.  PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE TENNESSEE CONSTITUTION.

---

[19]Plaintiffs did not plead Due Process violations with any specificity in the Amended complaint.  Nor did Plaintiffs cite to any cases in support of their Due Process claims in their Memorandum In Support of Application for Injunctive Relief.  Given that, it is hard for Defendants to respond to any such arguments.

In their amended complaint, Plaintiffs have raised purely an issue of state law.  Although the amended complaint never actually states Plaintiffs' actual claim, they appear to be asserting that the proposed actions of the Senate in "disqualifying" certain categories of voters in the Special Election would violate Art. IV, § 1 of the Tennessee Constitution.  In doing so, Plaintiffs have once again confused the standard and requirements for determining elibility to vote with the standards and requirements for counting votes.

Art. IV, § 1 provides in pertinent part as follows:

> Every person being eighteen years of age, being a citizen of the United States, being a resident of the State for a period of time as prescribed by the General Assembly, and being duly registered in the county of residence for a period of time prior to the day of any election as prescribed by the General Assembly, shall be entitled to vote in all federal, state, and local elections held in the county or district in which such person resides.  All such requirements shall be equal and uniform across the state, and there shall be no other qualification attached to the right of suffrage.
> The General Assembly shall have power to enact laws requiring voters to vote in the election precincts in which they may reside, and laws to secure the freedom of elections and the purity of the ballot box.

The Tennessee Supreme Court has held that the first part of this section defines who qualified voters are, *i.e.*, it sets forth the necessary qualifications for determining the existence of the right to vote. *See Vertress v. State Bd. of Elections*, 141 Tenn. 645, 214 S.W. 737 (1919). More importantly, however, is that this section does not specify how the right is to be exercised. Instead, this section vests in the Tennessee Legislature the authority to control the conduct of elections and such authority is held to be manifest. *See Bemis Pentecostal Church v. State*, 731 S.W.2d 897, 901 (Tenn. 1987).  Moreover, the only restriction on this right of control under ths Tennessee Constitution is that it cannot go beyond the limitation expressed in Art. I, § 5, which

37

provides that the right of suffrage will not be denied any person, except on conviction.  *See*

*Trotter v. City of Maryville*, 191 Tenn. 510, 235 S.W.2d 13 (1950).

Plaintiffs' claim under Art. IV, § 1 relies primarily upon the language "[a]such

requirements shall be equal and uniform across the state, and there shall be no other qualification

attached to the right of suffrage."  Based upon the Tennessee Supreme Court's interpretation,

however, this language refers to the qualifications for determining the existence of the right to

vote and not to how the right itself is exercise, including any determination of whether a

particular ballot should be counted or not.  Again, plaintiffs' claims rest not upon any assertion

that the Senate is proposing to apply non-uniform standards to determine whether plaintiffs are

qualified to vote.  Rather, their claims rest upon an assertion that the Senate is proposing to apply

non-uniform standards to determine whether plaintiffs' votes should be counted in violation of

Art. IV, § 1 of the Tennessee Constitution.  No authority for such a claim, however, is found in

that provision and, therefore, plaintiffs' claims should be dismissed.

### IV.  THIS COURT SHOULD NOT GRANT A PRELIMINARY INJUNCTION.

### A.  THE BALANCING TEST FOR A PRELIMINARY INJUNCTION.

When deciding whether to issue a preliminary injunction, a court should weigh four

factors:

> (1) whether the movant has a "strong" likelihood of success on the
> merits; (2) whether the movant would otherwise suffer irreparable
> injury; (3) whether issuance of a preliminary injunction would
> cause substantial harm to others; and (4) whether the public
> interest would be served by the issuance of a preliminary
> injunction.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).  These factors are not prerequisites but

rather, should be balanced against one another.  *Id.*

**B. PLAINTIFFS DO NOT HAVE A STRONG LIKELIEHOOD OF SUCCESS ON THE MERITS.**

For the reasons set forth above, Plaintiffs do no have a strong likelihood of success on the merits. At a bear minimum, for this Court to entertain this action, Plaintiffs must demonstrate that their claims are ripe, and they have standing to assert them. As explained in Section III(A) above, the claim is not ripe for adjudication as the Senate has yet to take any action either to officially seat Ms. Ford for the remainder of the session or to choose to unseat Ms. Ford because of defects in the election process. This lack of action makes Plaintiffs ' claims too abstract and conjectural for this Court to opine upon. Even assuming that the Senate will take action, this Court does not yet know the reasons for the actions taken. This has led to the Plaintiffs making every possible claim they could imagine and asking this Court to issue what amounts to an advisory opinion on each and every claim. Additionally, Plaintiffs do not have standing to assert any of the claims in the Complaint, as explained in Section III(B) above, because Plaintiffs cannot point to a concrete and particularized injury and any injury alleged cannot be traced to any of the Defendants. At best, Plaintiffs have pled several abstract and hypothetical injuries that may or may not occur some time in the future and would be the result of an action by the whole Senate, not any one Senator.

Even if Plaintiffs could demonstrate standing and ripeness, their claims will fail based upon the doctrine of abstention and federal court precedent not to interfere in the state election processes except for in very limited circumstances which do not exist here. As explained in Section III(c) above, abstention requires federal courts to respect the concept of comity and state independence in determining solutions for purely state issues. Each of the three part test for

when federal courts should abstain from considering a claim are satisfied here.  In addition to abstention, federal court precedent not to intervene in state election process are fatal to Plaintiffs' claims as explained in Section III(d) above.  Federal courts will only entertain state election issues when a discrete group of voters is denied the right to vote or disenfranchised after voting or when the election process is patently and fundamentally unfair.  Neither prerequisite to intervention exists here.

Finally, even if this Court should find that Plaintiffs can overcome their ripeness, standing, abstention, and intervention problems, Plaintiffs' claims must fail because they are without merit, as explained in Sections III(E) – (I) above.

## C.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT GRANTED.

The first question this Court must ask in relation to Plaintiffs' irreparable harm is what harm would occur if an injunction is not granted.  Because neither this Court nor the parties can be certain of what the Senate will do, this question is impossible to answer.  If the Senate chooses to seat Ms. Ford, than no harm will occur to any of the Plaintiffs without an injunction.  If the Senate chooses not to seat Ms. Ford because of reliable proof that the election was defective, then no harm will occur to any of the Plaintiffs without an injunction.  If the Senate chooses not to seat Ms. Ford based on unreliable proof, then the harm that will occur, assuming all Plaintiffs' arguments are correct, is that Ms. Ford will no longer be the Senate representative of the 29th District and Special Election will have been voided improperly.  This analysis shows that, in two out of the three possible results, no harm will occur at all.  In one of three possible results, some harm will occur.

The next step in the analysis will be to examine whether the harm will be irreparable.  If Ms. Ford is not seated, then, the Senate will officially send word to the Shelby County Commission of its decision, and the Commission shall appoint a citizen of the 29th District to serve out the remainder of this term (eight months).  Because Ms. Ford has been provisionally seated as a Senator, she will have notice and should be present for any Senate vote not to seat her, and she will know immediately if such a vote takes place.  In response, Ms. Ford could come to this Court and attempt to obtain a temporary restraining[20] enjoining the appointment of another senator.  If she were successful in such a motion, then the harm would be remedied within ten days of the vote not to seat her (at which point the Court would have had a hearing to determine if her claim were meritorious).  Given this quick turn around and possible remedy, it does not appear that, even in the one out of three situations where Ms. Ford will suffer any harm at all, that the harm suffered will be irreparable.[21]

## D.  THE DEFENDANTS WILL SUFFER SUBSTANTIAL HARM IF AN INJUNCTION IS GRANTED.

If the injunction is granted Defendants will suffer the substantial harm of being denied the right to govern state elections to the State Senate.  The Defendants will also suffer the harm of being subject to improper federal regulation of a purely state issue.  Finally, Defendants will suffer the harm of having their discretion abrogated by this Court in favor of Court ordered solutions.

---

[20]Ms. Ford has shown that she is quite capable of filing such a motion.

[21]This discussion is further proof that this injunction is still premature.  This Court should wait to see if any harm will result at all, and then consider these exact issues in deciding whether or not the harm should be enjoined.

41

This country was founded on the idea that there would be one union made up of numerous states that should govern themselves and act in concert for the sake of the union when necessary. *Younger*, 401 U.S. at 44. In furtherance of this idea, the federal courts have generally adopted the position that they should abstain from purely state matters. Id. *Courts have used the term "comity" to describe this respect for state functions. Id. The proper time for federal intervention is only when the states, in exercising their power of self governance, violate one of the enumerated rights that the United States Constitution or federal laws guarantees to all citizens of this country.* Here, the Plaintiffs do not claim that any such violation has occurred. They only claim that a violation **may** occur in the future, and to prevent that **potential** violation, this Court should direct the state in exactly how to govern itself, leaving no discretion to the Senate to decide for itself. The granting of the injunction requested would be a de facto power grab that would subjugate the rights of the Senate to exercise its judgment and discretion to the judgment and discretion of this Court, without first allowing the Senate to "speak."

## E. THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF NOT GRANTING THE INJUNCTION.

If this injunction is granted, the state will be irreparably injured in its ability to exercise its valid authority and enforce its laws, which are presumed to be constitutional. "In particular, the State's interest in not having its voting processes interfered with, assuming that such processes are legal and constitutional, is great." *Summit County Democratic Central and Executive Committee v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004).

There is no doubt that there is a strong public interest in allowing every voter to vote and have their vote counted, but there is as strong, if not stronger public interest in permitting

42

legitimate statutory processes to operate to ensure that only proper votes have been cast and a very strong public interest in protecting the integrity of the election of state officials.  There is also a strong public interest in protecting the integrity and authority of state governing bodies.

The Plaintiffs will only suffer harm in one of three possible circumstances; the harm they may suffer is not irreparable; the granting of an injunction will substantially harm the Defendants; and the public interest weighs heavily in allowing the state process to conclude before any federal intervention occurs.  Given all of this, this Court should deny the Plaintiffs' request for a preliminary and permanent injunction.

### IV.  CONCLUSION

For all the reasons stated above, this Court should deny the request for a preliminary injunction and dismiss the amended complaint in its entirety and with prejudice.

Respectfully submitted,

Paul G. Summers
Attorney General

/s William Helou
WILLIAM HELOU (BPR 22839)
Assistant Attorney General
Special Litigation Division

/s Janet M. Kleinfelter
JANET M. KLEINFELTER (BPR 13889)
Senior Counsel
P.O. Box 20207
Nashville, TN 37202-20207
Phone: 615-253-3327
Fax: 615-741-2009

### CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2006, a copy of the foregoing Memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing

system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

| | |
|---|---|
| David J. Cocke | John Ryder |
| The Bogatin Law Firm, PLC | Harris, Shelton, Hanover, Walsh |
| 1661 International Place Drive, Suite 300 | 2700 One Commerce Place |
| Memphis, TN 38120-1481 | Memphis, TN 38103 |
| | |
| Richard B. Fields | Lang Wiseman |
| 688 Jefferson Avenue | Wiseman Biggs Bray |
| Memphis, TN 38105 | 1665 Bonnie Lane |
| | Suite 106 |
| | Memphis, TN 38106 |

Dated this 24rd day of January 2006.


BY:      /s JANET M. KLEINFELTER_____
             Senior Counsel